DOUGLAS OIL CO. et al. v. STATE et al.
(WHITESIDE CASE).

No. 7828.

Court of Civil Appeals of Texas. Austin.

March 27, 1935.

Rehearings Denied April 17, 1935.

See, also (Tex. Civ. App.) 70 S.W.(2d) 452; (Tex. Sup.) 76 S.W.(2d) 1043.

W. A. Keeling, of Austin, Francis H. De Groat, of Duluth, Minn., Chas A. Holden, of Tulsa, Okl., and Chas. Gibbs, of San Angelo, for appellant Douglas Oil Co.

I. S. Handy and A. D. Dyess, both of Houston, for appellant Federal Royalty Co.

A. D. Dyess, of Houston, for appellant P. S. Moore.

Robt. T. Neill, of San Angelo, and Turner, Rodgers & Winn, of Dallas, for appellant Stanolind Oil & Gas Co.

Rex Baker, R. E. Seagler, and Gilvie Hubbard, all of Houston, Ben H. Powell, of Austin, for appellee Humble Oil & Refining Co.

R. L. Batts, of Austin, Jno. E. Green, Jr., of Houston, and Wm. L. Wise, and P. O. Settle, both of Fort Worth, for appellee Gulf Production Co.

Thompson, Mitchell, Thompson & Young, of St. Louis, Mo.; and P. G. McElwee, of Houston, for appellee Shell Petroleum Co.

E. H. Yeiser, of Austin, for appellees D. C. Reed, E. H. Perry, M. H. Reed, and Bernard Mollberg.

T. R. Boone, of Wichita Falls, for appellees Mrs. Ida May and George W. Ramsey, and Viola Seeley.

Burney Braly, and G. R. Pate, both of Fort Worth, and G. B. Smedley, of Austin, for appellee Continental Oil Co.

Jas. V. Allred, Atty. Gen., and R. W. Yarborough, Asst. Atty. Gen., for the State.

Collins, Jackson & Snodgrass, of San Angelo, for appellees Western Oil & Royalty Co., M. D. Bryant, P. L. Childress, W. M. Hemphill, and C. C. McBurnett.

John A. Braly, of Fort Worth, for appellees Peerless Oil & Gas Co., Southland Royalty Co., and Argo Royalty Co.

A. M. Gee, of Findlay, Ohio, R. C. Gwilliam, of Tulsa, Okl., and Hiner & Pannill, of Fort Worth, for appellees H. B. Davenport, Nellie M. Moore and Mid-Kansas Oil & Gas Co.

Smith & Neill, of San Angelo, for appellees J. A. Chapman, Brown Oil & Royalty Co., and Indian Territory Royalty Co.

Don Emery, of Amarillo, for appellee Phillips Petroleum Co.

Walter L. Kimmel, of Tulsa, Okl., for appellee Hargrove Hudson.

McCLENDON, Chief Justice.

Questions arising in this cause have been twice certified to the Supreme Court. Questions embodied in the first certificate were answered. 122 Tex. 369, 61 S.W.(2d) 804. The second certificate was dismissed; the order reciting that the dismissal was "because it certified the whole case to this Court." In a per curiam opinion [(Tex. Sup.) 76 S.W.(2d) 1043, 1044], the following additional reason is given: "The certificate calls upon the Supreme Court to give an advisory opinion, which is not permitted. Morrow v. Corbin, 122 Tex. 553, 62 S.W.(2d) 641." Since a proper adjudication of the case now before us involves directly the proper construction and application of the answers to the questions first certified, and incidentally an interpretation of the dismissal order, we quote in full the body of the second certificate and of the appended tentative draft of opinion; the latter embodying in full the body of the first certificate:

"The above cause is pending in this court on appeal from a final judgment of the District Court of Travis County, 53rd Judicial Dis-

trict, and upon answers of the Supreme Court to questions certified by this court.

"The question herein certified is material to a decision of the appeal, and grew out of the nature and result of the proceeding and the facts disclosed by the record before us.

"This is the same cause in which questions were certified to Your Honors on the 31st day of October, A. D. 1932, which bore No. 6388 on the docket of your court, and in which answers to the certified questions were certified to this court on the 30th day of June, 1933, embodied in an opinion by Associate Justice Pierson, reported in 122 Tex. 369, 61 S.W.(2d) 804.

"The case was thereafter re-set for oral argument in this court, and the parties requested either to re-brief the case, or file further briefs or arguments in the light of the answers of the Supreme Court to the certified questions, eliminating such questions or issues as were determined by such answers.

"From these briefs and arguments and the oral arguments upon the hearing, it develops that some of the original appellants are now asking an affirmance of the trial court's judgment; one of the appellants and a number of the appellees are asking a reversal; and the State is assuming an apparently neutral attitude.

"As the case is now presented, the controlling question arises over the proper construction of the answers of the Supreme Court to the questions certified. It is contended by those seeking reversal, on the one hand, that the answer of the Supreme Court to the first question certified to the effect that the first locative method (course and distance calls from the east line of Block Z) constitutes the proper method of locating the involved surveys, is controlling and determinative of the entire boundary controversy. It is contended by those seeking affirmance, on the other hand, that the answer to this certified question has merely eliminated from the case the third locative method which gave effect to the Durrell field notes calls for the river and other surrounding surveys; that the first locative method was not involved in the appeal, because:

"1st. There were no pleadings to support it;

"2nd. It is precluded under the 'theory of the case' doctrine, since none of the parties contended for that method either in the trial court or in this court prior to the certificate, the only locative method contended for by any of the parties being the second and third.

"3rd. The trial court's judgment holding the Dod survey valid is supported by the pleaded and proved theory of agreement and/or estoppel, operating upon all the parties independently of the proper legal locative method. It is contended in this regard that the:

"'Certified question answered by the Supreme Court as to how the various surveys in Block 194 should be constructed is not the "very question" ruled upon by the lower court because it is not the true question presented by the pleadings and the evidence, therefore the decision of the naked question presented does not determine the case as plead and tried.'

"It is manifest, therefore, that a determination of this controversy as to the proper interpretation to be placed upon the answer of the Supreme Court to the first question certified is essential to and controlling of the decision in the case by this court.

"We have prepared and attach hereto as Exhibit 'A' a tentative opinion in the case, drafted upon the hypothesis that the answer of the Supreme Court to the first question certified precludes consideration of the several grounds above enumerated, urged in behalf of those now seeking an affirmance of the trial court's judgment, and requires reversal of the trial court's judgment.

"In presenting the question in this form it is not to be understood that the holdings expressed in this tentative opinion represent conclusions which this court has reached. This form was used because it was thought that the question we are now certifying could be more clearly and accurately presented in this manner. The opinion does, we think, present the case most thoroughly in support of the decision it reaches.

"The issue involved presents a question of grave and serious doubt in our minds, and its final determination in advance of a final decree in this court appears to us most important.

"Your Honors are familiar with the circumstances under which the boundary questions involved in this and the companion California Case were reluctantly by this court certified to Your Honors. The considerations which induced this certificate are set forth in the attached tentative draft of opinion.

"The boundary question involved in this case affects a very large area and includes large portions of the Yates oil pool field. There are over 170 parties to the litigation, a great many of whom do not appear to be

represented by counsel on appeal. The importance both to the State and the other litigants of having the boundary issue finally adjudicated was and is apparent. The main objective of our former certification was to obtain an adjudication by the Supreme Court which would be conclusive and leave nothing for further determination, in so far as concerns the true boundary of the involved surveys. This objective this court made a bona fide effort to achieve in certifying the boundary question to Your Honors, by predicating the questions certified upon the entire record in the case. The questions so certified.were accepted and answered by Your Honors.

"The last paragraph of the Supreme Court's opinion in this case is cited and strenuously urged as supporting the above contention that the answer of the Supreme Court to the first question certified is academic and not determinative of the very question for decision in this case. That paragraph reads:

" 'In answering the certified questions in this case, we have purposely avoided expressing any opinion on issues other than those involved in the questions certified.'

"The determination of the issue thus raised, involving as it does the proper construction of the Supreme Court's decision in answering the first certified question in this case is not only vital to our decision as above noted, but such determination prior to our decision will greatly facilitate an early adjudication in this case, the importance of which is apparent from the foregoing statement, and will no doubt be readily apparent to Your Honors in view of your intimate knowledge of the records and issues presented in the three companion cases.

"Believing as we do that these considerations make it our duty to do so, we, therefore, certify to Your Honors the following question:

"Is the holding in the tentative draft of opinion hereto annexed, to the effect that the answer of the Supreme Court to the first question certified precludes consideration of the issues above stated under which an affirmance of the. judgment of the trial court is now urged, correct?"

The appended tentative draft of opinion follows:

"This is a boundary suit.

"As preliminary to a clear understanding of the questions involved, the opinions of the Supreme Court in this (the Whiteside) Case, 122 Tex. 369, 61 S.W.(2d) 804, and in the companion California Case, 122 Tex. 377, 61 S.W.

(2d) 807, and in the Smith-Turner Case [Turner v. Smith], 122 Tex. 338, 61 S.W.(2d) 792, are referred to with special reference to the map at page 791 [797] of 61 S.W.(2d) [122 Tex. 338]. We refer also to our opinion in the California Case (Tex. Civ. App.) 70 S.W.(2d) 452.

"This suit, as originally brought by the State, involved all the area bounded on the west by Block Z, on the south by Block 178, on the east by the river surveys, and on the north by Runnels County School Land and other surveys immediately to the west thereof. Later by amended pleadings, the area in controversy was reduced to the 26 surveys in Block 194, bounded on the west by surveys 11, 10, 7 and 6, in Block Z, on the south by Block 178, and on the east by surveys 20, 21, 31, 32, 33 and 34, Block 194, and on the north by the north lines of surveys 35, 36, 37, 4 and 3, of Block 194.

"Four methods of locating the surveys in Block 194 as advocated by various litigants in the three cases are set forth in the certificate of this court to the Supreme Court in this case [122 Tex. 369, 61 S.W.(2d) 804, at pages 805, 806]. The first of these methods (course and distance calls from the east line of Block Z) was adjudicated by the Supreme Court to be the correct method in this [122 Tex. 369, 61 S.W.(2d) 804, 806], as well as in the other two companion cases. The map at page 797 of 61 S.W.(2d) [122 Tex. 338], is drawn in acordance with this method. The area involved in the Smith-Turner Case was the adjudicated vacancy delineated in this map as the shaded area between the Yates survey on the east, and the eastern tier of surveys in Block 194 on the west. The area involved in the California Case was 106 acres claimed to constitute a vacancy between surveys 34 and 35, Block 194, and the area contained in said two surveys.

"The pleadings of the State upon which it went to trial are predicated upon the validity of the resurvey made by Captain Dod, in 1917, as supporting the second method; which method was adopted by the trial court in this case. The theory of the State in the Smith-Turner and California Cases was that the first method was the correct one. In this connection we quote from the Supreme Court's opinion in the California Case [122 Tex. 377, 61 S.W.(2d) 807, at page 809]:

" 'On the 17th day of November, 1932, the state filed in this court a brief, which is prefaced by the following statement: "Since regard for established rules of law as we un-

derstand them and regard for the State's financial interest joined in impelling us to adopt the theory that we did adopt in behalf of the State in the Whiteside Case it has become necessary for us to say to this Honorable Court that we consider the judgment in this case to be erroneous." '

"The appellants in this case are Federal Royalty Company, Douglas Oil Company and California Company; of these only the Federal Royalty Company (owner of royalty interest in sections 30 and 32, Block 194) is now seeking a reversal of the trial court's judgment. The other two appellants now (since the Supreme Court's adjudication of the boundary issue) ask affirmance of the trial court's judgment upon the grounds stated below.

"The Federal Royalty Company in its prayer for reversal is joined by appellees H. P. Davenport, Nellie M. Moore, and Mid-Kansas Oil & Gas Company (royalty owners in sections 30, 31, 32 and 33, Block 194); by appellee Shell Petroleum Company, whose interest is not stated in its supplemental brief; and by Stanolind Oil & Gas Company, styling itself appellant.

"From the supplemental brief filed by the State its present attitude appears to be one of neutrality. However, it submits certain suggestions, 'in the event the case is either (1) affirmed, (2) reformed and affirmed, or (3) reversed and rendered.'

"The contentions upon which affirmance of the trial court's judgment is now urged by the two appellants and the several appellees above named, stated substantially, are:

"1. The pleadings upon which the trial was had will not support a judgment based upon the first locative method, because that method was not presented in the pleadings; and only the second and third methods were presented or contended for by the State or any of the parties litigant.

"2. Under the 'theory of the case' doctrine as applied to the record made in the trial court and to the original assignments of error and briefs of appellants in this court, the first method cannot be considered, since it was not presented by any party litigant. The judgment predicated upon the second method must, therefore, be affirmed, since the only other methods contended for were by the Supreme Court adjudicated invalid.

"3. The pleadings and evidence sustain the issue that the Dod survey was agreed to and acted upon by all the parties to this suit, and they are now estopped from asserting its invalidity, independently of the proper legal method of locating the involved surveys.

"The issues presented by those contentions are entirely different from those presented in the California Case and from those presented in this case prior to the Supreme Court's adjudication; and have necessitated a very careful re-examination and study of the entire record, in the light of the decision of the Supreme Court in answering the certified questions in this case.

"We hold that these contentions cannot be sustained; and that the trial court's judgment should be reversed and the cause remanded generally, under the conclusion we have reached, which follows:

"The boundary question in this case having been certified to the Supreme Court upon the entire record, the answers of the Supreme Court to those questions constitute an adjudication binding upon this court that the first locative method is the correct one to be applied by this court in this case.

"The certificates in this and the California Cases are, we believe, unique, in that they are predicated, not upon any statement or finding of the certifying court, but upon the entire records in the cases which were transmitted to the Supreme Court along with the certificates and were thereby made parts of the certificates. This court was not unmindful of the fact that such method of certification was not in conformity with the rules and that the certificates might therefore be subject to dismissal. This situation was communicated to the Supreme Court, with the resultant assurance that a strict compliance with the rules in the stated regard would not be insisted upon, in view of the importance of having before that court prior to adjudication in the Smith-Turner Case all of the litigants whose interests would be affected by the boundary decision in that case, and the complete records in the several cases. Under these circumstances and with this assurance, the cases were certified.

"Counsel insisting upon an affirmance lay much stress upon the last paragraph of the opinion of the Supreme Court in this case, which reads:

" 'In answering the certified questions in this case, we have purposely avoided expressing any opinion on issues other than those involved in the questions certified.'

"It is to be noted that this paragraph in identical language also concludes the opinion in the California Case.

"Such would be the effect of the answers of the Supreme Court to the certified questions regardless of this express statement in the opinion; and while it may be unusual for such opinions to be thus expressly guarded, we are unable to conceive upon what theory this paragraph could have any essential bearing upon the proper construction to be placed upon the language of the certificate and the Supreme Court's answer, as regards the meaning, scope and effect of such answer. Probably, in view of the volume of the briefs and records in both cases, the Supreme Court deemed it advisable as a measure of extreme precaution, to embody these paragraphs in the two opinions. One is manifestly copied from the other. However that may be, we are clear in the view that the Supreme Court's answers to the certified questions are binding upon this court, not merely in the abstract as presenting the proper locative method under pleadings and other record matters not presented in this case, but as applied to the entire record in this case which was transmitted to the Supreme Court along with the certified questions.

"At the risk of some repetition, and in view of the importance of the questions now before us, we think it advisable to quote in full the body of the certificate transmitted by this court to the Supreme Court in this case:

" 'This cause, which will be referred to as the Whiteside Case, and cause No. 7533 of the same style [70 S.W.(2d) 452] which will be referred to as the California Case (each pending in this court on appeal from a final judgment of the district court of Travis county, 53rd Judicial District), and cause No. 5395, Fred Turner, Jr., v. Mrs. M. A. Smith et al. [122 Tex. 338, 61 S.W.(2d) 792] pending upon your docket upon writ of error granted to the Court of Civil Appeals, 8th Supreme Judicial District, El Paso (opinion of the latter court published in 13 S.W.(2d) 152, et seq.), are companion cases, in that they all involve the proper location of boundary lines of a number of surveys in Block 194 (G. C. & S. F. R. R. Co.), in Pecos County. Valuable oil deposits in what is known as the Yates oil field, from which large quantities of mineral oil are being produced, underlie the lands in suit; and the involved boundary controversy affects large property interests of the parties litigant including the state school fund. A final adjudication of the controversy as early as practicable is therefore urgent.

" " 'In view of the holding in Porter v. State (Tex. Civ. App.) 15 S.W.(2d) 191 (error refused), and Blaffer v. State (Tex. Civ. App.) 31 S.W.(2d) 172 (error refused), that under the doctrine of stare decisis the binding effect of a final adjudication of the Supreme Court establishing a boundary line is not limited to those party and privy to the litigation, we deem it most important that all of the parties to all of these cases be accorded the right to a hearing in the Supreme Court before final adjudication in the Smith-Turner Case. These considerations have moved us to yield to a request of counsel for some of the parties in the Whiteside and California Cases to certify to Your Honors the issues involved in this boundary dispute. Under these exceptional circumstances and with the stated objective, it will not be practicable to make the certificates complete in themselves so as to preclude examination of the record; since to do so would impose limitations upon the parties in presenting their several views, constructions, and interpretations of the record as applied to the ultimate issues to be decided. Certificates so limited would leave open for subsequent review by writ of error questions involving interpretation of the certificates' statements of the records; and to that extent the purpose of certifying would be defeated. We are, therefore, transmitting with the certificates the entire record in each case.

" 'In the California Case the State's suit was predicated upon the theory that Section 34, Block 194, is properly located by distance calls from the E. line of Block Z. The area involved includes Section 34 as thus located and a resultant vacancy east of Section 34. The proper location of Section 34 is directly, and that of Sections 33, 28 and 35 and Survey 34½ are incidentally in issue.

" 'The area involved in the Whiteside Case includes Sections 4, 5, 7 to 19, 22 to 28, 31, 33 and 35 to 38, Blk. 194.

" 'The boundary dispute arises from various discrepancies between course and distance calls in the field notes of Blocks 194 and 178 (concededly office surveys) for adjoinders with surrounding senior surveys, on the one hand, and the actual ground positions of the senior surveys, on the other.

" 'The opinion of the El Paso Court in the Smith-Turner Case (Tex. Civ. App.) 13 S.W. (2d) 151, 161–166 gives a rather full statement of the documentary evidence introduced in that case, which constitutes, also, the major portion of such evidence introduced in the California and Whiteside Cases. Your Honors are already familiar with the record in the Smith-Turner Case. And since we are making no fact findings in these certificates, it will only be necessary to set forth the

several methods urged for establishing the boundaries in issue.

" 'As we gather from the briefs there are four such methods advanced, which, for convenience of reference, we will designate by numbers.

" 'First Method:

" 'This method gives effect to the adjoinder calls in field notes of Block 194 for the E. and W. line of Block Z and for the lines of surveys in Block 12, but rejects all other adjoinder calls for senior surveys to the south, north and east of the sections in Block 194 lying east of Block Z. Under this method the boundary lines in issue are established by course and distance calls from the E. line of Block Z. This method was urged below in the California Case by the State and the Turner interests, and is still contended for by the latter. It was adopted by the trial courts in the California and Smith-Turner Cases.

" 'In this connection and in connection with the second and third methods it should be noted that the N. E. corner of Block Z is established in both cases by projection from the concededly established S. E. corner of Block Z (Perry Hill corner) and the N. E. corner of Section 33, Block Z (Canyon corner). This latter corner was established by jury finding in the California Case and by court finding in the Whiteside Case. So located the E. line of Block Z has an excess of 30.2 varas per section. It is contended by appellees Reed et al. in the Whiteside Case that Block Z was an office survey, that Canyon corner was not proved an original corner, and that Block Z must be constructed by its field note calls from its established S. E. (Perry Hill) corner. The issue thus raised becomes material to each of the first three methods.

" 'Second Method:

" 'This method differs only from the first in that it does not reject the adjoinder calls in Block 194 for Block 178 or of the latter for Blocks C–3 and C–4. It does reject the adjoinder calls of Blocks 178 and 194 for Block 1, and of Block 194 for Runnels County School land. It establishes the S. E. corner of Section 7 Block C–3 at 7 miles plus 476 varas E. of Perry Hill corner, giving each of the intervening seven tiers of sections an excess width of 68 varas over field note calls, thus establishing the S. W. corner of Section 7, Block C–3 at 1968 varas west of its S. E. corner. From the thus established S. W. corner of Section 7, Block C–3 projected north the east lines of Sections 19, 22, 23 and 28,

Block 194 are established, and each of the six tiers of surveys intervening between this line and the E. line of Block Z is given an excess width over call of 68 varas. The remaining involved sections (31, 33 and 35 to 38) are established by their course and distance calls except where the latter (distance) is modified by adjoinder calls to other established sections in Block 194. (See field notes of these sections in judgment at pages 661 to 663 of the transcript in the Whiteside Case). This method was contended for by the State and adopted by the trial court in the Whiteside Case, and is now urged by the State in its brief in this court.

" 'It should be noted in this connection that the Turner interests (not parties to the Whiteside Case) reject the S. E. and S. W. corners of Section 7, Block C–3 as established in that case, contending that the evidence in that regard was not developed in the Whiteside Case but that in the California Case the location was discredited or disproved. If this method is adopted, the issue thus presented will become material.

" 'Third Method:

" 'This method (contended for by Douglas Oil Company) gives effect to all adjoinder calls in Blocks 194 and 178 for surrounding surveys, disregarding where essential to such adjoinder, course and distance calls. This method necessitates some equitable adjustment of the area involved among the affected sections in Blocks 194 and 178. A proposed such adjustment as to the Block 194 affected sections is presented in Douglas' Oil Company's map exhibit No. 95 in the Whiteside Case. Should this method be adopted the proper basis of apportioning the affected area will become material.

" 'Fourth Method:

" 'This method (contended for by appellees Reed et al. in the Whiteside Case and in the alternative by Douglas Oil Company) disregards all adjoining calls in Blocks 194 and 178 for surrounding surveys, except the calls of Block 194 for Block 178, and establishes all of the survey lines in Blocks 178 and 194 by course and distance calls of intervening surveys from Pecos Springs corner. This method is exemplified in map exhibit No. 93 of Douglas Oil Company in the Whiteside Case.

" 'For the reasons above outlined, we deem it advisable and our duty to certify for your decision the following questions:

" '1. Which of the above four is the proper method to be applied in establishing the boundary lines of the involved survey?

" '2. If either of the first three is the proper method, is the N. E. corner of Block Z properly established from Canyon corner?

" '3. If the second is the proper method, is the S. W. corner of Section 7, Block C-3, properly established at the point fixed by the trial court in the Whiteside Case; and if so did the trial court in that case adopt the proper method of fixing from that established point the boundaries of the involved surveys?

" '4. If the third method is adopted, what is the proper method of establishing the boundaries of the involved surveys from the called adjoinder points and lines of surrounding senior surveys?'

"It will be noted that question 1 calls for the adjudication by the Supreme Court of 'the proper method to be applied in establishing the boundary lines of the involved surveys.' 'Involved surveys' was intended to mean and could only mean the surveys involved in the particular case certified. 'Proper method' was intended to mean and could only mean the method which under the entire record in this case, including the pleadings and other matters of record from which the theory of the case could be determined, this court must render judgment in so far as the boundary issue was concerned.

"That the Supreme Court was fully cognizant of this construction of the questions certified, appears we think affirmatively from the expressions in the opinions of that court.

"In its opinion in this case the Supreme Court expressly adverts to the fact that this court 'has certified for our determination upon the whole record in the case questions based upon said methods as follows:'

"That the Supreme Court was fully cognizant of the issues raised by the pleadings and by the contentions of the respective parties in the respective cases, and that the first method was not urged by any party in this case, affirmatively appears from the following quotation from its opinion in this case:

" 'This amended petition omitted the eastern tier of boundary sections of block 194, and dismissed from the case, among other defendants, Fred Turner, Jr. This left in the case two groups of defendants; one making the Yates contention that surveys in block 194 should be given an excess west to east of 68 varas to the mile by projecting a meridian northward from the position asserted to be the southwest corner of survey 7, block C-3, with which contention the state is in accord in this case; the other making the Douglas, Whiteside, or Smith contention for

an adjoinder of the lines of block 194 with the river surveys on the east and Runnels county school land on the north.'

"In certifying the boundary question to the Supreme Court, we were not certifying a mere abstract or hypothetical question, but the concrete question before us based upon the entire record in the case, as a guide to this court in the judgment which should be rendered.

"This was unquestionably the construction which the Supreme Court placed upon the certificate. Smith-Turner Case, from page 794 of 61 S.W.(2d) we read:

" 'These cases are being considered together, and a decision of each will be controlled by our holdings herein. The determination of these cases depends upon the legal method of locating on the ground block 194, G. C. & S. F. Ry. Company, in Pecos County, as surveyed by L. W. Durrell (an office survey) in 1883.'

"This language we think is clear and susceptible of but one construction. 'A decision of each will be controlled by our holdings herein,' clearly means that the Supreme Court's holdings should control a decision in the instant case, based upon the entire record certified. By the language, 'the determination of these cases depends upon the legal method of locating on the ground block 194, G. C. & S. F. Ry. Company, in Pecos County, as surveyed by L. W. Durrell (an office survey) in 1883,' manifestly was meant that this case as well as the other cases were to be determined by the legal method of location which was adjudicated in the Smith-Turner Case, and not by some other method, upon whatsoever predicated. 'To determine' is to settle, to end; and 'to depend upon' is to be suspended by as its only means of support.

"The Douglas Oil Company in its brief asserts as its first proposition in support of its contentions:

" 'The certified question answered by the Supreme Court as to how the various surveys in Block 194 should be constructed is not the "very question" ruled upon by the lower court because it is not the true question presented by the pleadings and the evidence, therefore the decision of the naked question presented does not determine the case as plead and tried.'

"The effect of this proposition is that the first locative method was in fact not involved in this case, and was academic, in so far as this case is concerned. If this be true then this court did a useless thing in certifying

this method in this case, and the Supreme Court did likewise in its answer, which, in so far as this case is concerned, was a pure abstraction. 'If abstract questions are certified the Supreme Court has said very plainly it will not consider them.' 3 Tex. Jur. p. 311, and authorities cited in Note 12.

"The very purpose of basing the certificates upon the entire record, as clearly expressed therein, was to obtain a decision of the Supreme Court which would be binding upon this court, and from which this court could render its final decision, and 'not leave open for subsequent review by writ of error questions involving interpretation of the certificates' statements of the record.' No objection was made in this court or in the Supreme Court to the certificate or to the questions certified.

"Under these circumstances it seems quite plain to us that we are bound to apply the answer of the Supreme Court to the entire record in the case before us, since the questions were certified and the answer returned upon the entire record.

"Since the case was tried upon the theories which the Supreme Court has held to be untenable, we believe the proper practice is to remand the case generally, without direction to the trial court, other than as may be implicit in the decision of the Supreme Court, as herein interpreted.

"The trial court's judgment is reversed and the cause remanded."

Since the dismissal of the second certificate a number of appellees, in addition to those already noted, have joined appellants Federal Royalty Company and P. S. Moore in seeking reversal of the trial court's judgment. For the sake of convenience we will refer to all appellants and appellees now asking reversal as appellants, except where otherwise noted. Altogether some twenty additional briefs and arguments have been filed since the Supreme Court's answers under the first certificate. It will not be practical to discuss in detail all the points urged by the several parties, or the cited authorities. We shall confine ourselves to a consideration of what we regard as the controlling issues in the case, under the conclusions we have reached as to its proper disposition.

In drafting each of the certificates we were not unmindful of the rules that: (1) Only questions of law arising upon the record on appeal may be certified; (2) the answers to the questions certified are binding only as adjudications of those questions; and (3) the application of such adjudications to the record as determinative of the judgment to be rendered by this court is not involved in the certificate or adjudicated by the Supreme Court's answers.

The unusual circumstances under which the first certificate was made upon the entire record, and without the usual and essential fact finding or statement by this court, are sufficiently stated above.

The dismissal of the second certificate upon the stated grounds, if our construction of it is the proper one, may be helpful in interpreting the answers to the questions first certified. Of particular significance do we regard the second ground of dismissal, and especially the supporting reference to Morrow v. Corbin, 122 Tex. 553, 62 S.W.(2d) 641, 651, which reference requires some examination into that decision.

Morrow v. Corbin, held invalid an act of the Legislature authorizing, in advance of adjudication, either interlocutory or final, certification by the trial court to the Court of Civil Appeals of certain characters of law questions arising in pending cases.

As we read the opinion, the act was declared invalid on two separate and distinct grounds:

(1) That it authorized certification of questions calling for advisory opinions.

(2) That appellate jurisdiction is inherently limited to review of decisions or judgments, either interlocutory or final, of the inferior court, and the adjudication of questions of law in advance of such adjudication does not fall within its scope.

The opinion cites and quotes with approval from the dissenting opinion in Darnell v. Lyon, 85 Tex. 455, 459, 22 S. W. 304, 305, 960, in which Chief Justice Stayton held invalid the statute which authorizes certification from the Courts of Civil Appeals to the Supreme Court in advance of any decision by the former.

We believe that a careful study of that opinion will lead to the conclusion that Judge Stayton predicated his holding upon the sole ground that the jurisdiction sought by the statute to be conferred on the Supreme Court was not appellate, in that no consequential relief could be awarded by the Supreme Court; and not upon the ground that advisory opinions, in the sense that answers of the Supreme Court would not be binding upon the Court of Civil Appeals, were thereby sought to be authorized.

This we think is clearly manifest from the first paragraph of the opinion, which reads: "There can be no doubt of the intention of the legislature to confer upon the supreme court jurisdiction of a question of law found in a case appealed to a court of civil appeals, although that court had made no decision of the question or cause, interlocutory or final in character, nor can there be doubt of the intent to make the decision of the supreme court on the question certified binding upon the court of civil appeals."

The gist of his holding is, we believe, embodied in the following quotation: "Jurisdiction of a given cause means the power to hear and determine the right of the parties, as the judges of the court under their official oaths may think it ought to be, and to refer it to another court for a decision, and to simply register its decree as a rule of right between the parties is in no sense the exercise of jurisdiction."

The latter part of the opinion is devoted to the practice in federal courts under the Act of Congress of April 29, 1802 (1 Stat. 156) authorizing in advance of decision certification of questions of law from circuit courts to the Supreme Court when the circuit judges disagreed. The concluding paragraphs of that discussion, which also conclude the opinion, read:

"It is submitted that there can be no other ground than that it was necessary such jurisdiction should be exercised to enable the court to exercise the appellate jurisdiction conferred by the constitution.

"The circuit courts could render no judgments when the judges disagreed, for there were but two judges, and their right to decide equal; and the necessity for a final judgment as the basis for a revision by that court was evidently the ground on which the appellate jurisdiction of the supreme court was based.

"The reasoning through which such a result may have been reached may not be satisfactory to all minds, but on what other ground can the decisions be based?

"Under the organization of the courts of civil appeals, no necessity arises for a decision by this court, in first instance, of the questions certified to this court.

"If the ground suggested be not that on which the supreme court of the United States exercise appellate jurisdiction on questions certified, and it be true that the holding was broadly that appellate jurisdiction existed without reference to the necessity for its exercise to secure a judgment final in its nature, which the court would have power to revise, then the inquiry arises whether this court should follow the decisions of that court, or decisions made by the supreme court of the republic, recognized by the supreme court of this state, on the same question. Phillips v. Hill, 3 Tex. [397], 398.

"I deem it my duty to follow the latter, not only because the decisions made under the constitution of the republic were made upon an article of a constitution in all material respects the same as that now in force here, and operative in this state, and may therefore be supposed to have been looked to as furnishing a rule of interpretation or construction, but also because I believe the rule announced by the supreme court of the republic to be the only correct one to be applied to the matter now before this court."

Judge Stayton's view thus appears to be that there was a conflict between holdings of the federal Supreme Court and those of the Texas Republic Supreme Court, unless they could be reconciled upon the ground stated by him; and that it was his conviction that, regardless of such conflict, the Texas cases should be followed, as being sound in principle.

The following from Chief Justice Taney's opinion in U. S. v. Stone, 14 Pet. 524, 525, 10 L. Ed. 572, decided in 1850, may throw some light upon the federal practice under the act of 1802: "We are aware, that in some cases, where the point arising is one of importance and difficulty, and it is desirable, for the purpose of justice to obtain the opinion of this court, the judges of the circuit court have sometimes, by consent, certified the point to this court, as upon a division of opinion; when, in truth, they both rather seriously doubted, than differed about it. We do not object to a practice of this description, when applied to proper cases, and on proper occasions. But they must be cases sanctioned by the judgment of one of the judges of this court, in his circuit. A loose practice in this respect might render this court substantially a court for the original decision of all causes of importance: when the constitution and the laws intended to make it altogether appellate in its character; except in the few cases of original jurisdiction enumerated in the constitution."

Later holdings of the federal Supreme Court sanction the practice of certification, in advance of decision, of law questions from inferior courts to that court, even when there is no disagreement of the judges of the

certifying court. In the comparatively recent case of Wheeler Lumber Co. v. U. S., 281 U. S. 572, 50 S. Ct. 419, 420, 74 L. Ed. 1047, 1051, the subject is discussed at some length, with citation of authorities. In that case the court answered a question certified by the court of claims under U. S. C. title 28, § 288 (28 USCA § 288). We read from the opinion:

"This is a new provision. Similar provisions have permitted particular federal courts to certify questions to this Court, but this provision is the first giving such authority to the Court of Claims.

"There are two reasons why a certification by that court which embraces the whole case cannot be entertained by this Court. One is that to accept such a certification and proceed to a determination thereon, in advance of a decision by that Court, would be an exercise of original jurisdiction by this Court contrary to the constitutional provision which prescribes that its jurisdiction shall be appellate in all cases other than those affecting ambassadors, other public ministers and consuls, and those in which a State shall be a party. Article 3, § 2, cl. 2. The other is that the statute permits a certification only of 'definite and distinct questions of law.'

"Even the restricted certification permitted by the statute invokes action which is rather exceptional in the appellate field. But that such action is appellate is now settled. Early and long-continued usage amounting to a practical construction of the constitutional provision requires that it be so regarded."

Two of the recent "gold clause" cases (those involving United States gold certificates and bonds) were carried to the Supreme Court from the Court of Claims upon certificates. Nortz v. U. S. (U. S.) 55 S. Ct. 428, 79 L. Ed. ——, 95 A. L. R. 1346 and Perry v. U. S. (U. S.) 55 S. Ct. 432, 79 L. Ed. ——, 95 A. L. R. 1335.

The practice of review by certification is in vogue in a number of the states. 3 Corpus Juris (pp. 989 et seq.) lists twenty-four. Several have been added since the publication (1915) of that volume.

Whatever view may be taken of the basis of jurisdiction entertained under the act of 1802 at the time Judge Stayton wrote his dissenting opinion, it is clear that the present holding of the federal Supreme Court presents a conflict with the early Texas decisions, and that the view of Judge Stayton was to the effect that certification from an inferior to an appellate court, in advance of decision by the former, is to invoke original, and not appellate, jurisdiction.

The expression "advisory opinion" ordinarily connotes the practice which existed in England from very early times of extrajudicial consultation of the judges by the Crown and House of Lords. The latest edition (1934) of Webster's International Dictionary gives this definition: "Advisory Opinion: A formal opinion by a judge or judges, or a court or a law officer upon a question of law submitted by a legislative body or a governmental official, but not actually presented in a concrete case at law. Such opinions have no binding force."

The practice was embodied in the first Constitution (1780) of Massachusetts; and later in the Constitutions of the following states: New Hampshire, 1784; Maine, 1820; Rhode Island, 1842; Missouri, 1865 (repealed 1875); Florida, 1868; Colorado, 1886; South Dakota, 1889. In a few states advisory opinions have been given under supporting statutes in the absence of constitutional authority; one state (Minnesota) holding such a statute unconstitutional. In a small number of states advisory opinions have at times been given without supporting authorization either constitutional or statutory. The literature upon this subject is quite extended. The following treatises may be noted: Ellingwood's "Departmental Cooperation in State Government" (1918); Hudson on "Advisory Opinions of National and International Courts," 37 Harvard Law Review, 970 (June, 1924), with appended note by Felix Frankfurter (Id. p. 1002); 15 C. J. p. 785 et seq.

The giving of advisory opinions is generally recognized as a nonjudicial function; and except as noted above has not been practiced in any of the American states. An authorizing provision was proposed in the Federal Constitutional Convention, but was defeated; and the Supreme Court of the United States has always declined to recognize it as within its constituent authority. This view, held also by the state courts except as noted, is a necessary conclusion from the constitutional separation of the powers of government into the three departments, executive, legislative, and judicial, and the essentially implicit deduction that, absent express constitutional authorization, none of these departments may exercise any of the powers inherently pertaining to another.

While historically, and as a consequence technically, "advisory opinion" is limited by the above definition, the courts latterly have

extended the expression to questions presented which do not arise in such a manner as to admit of a binding adjudication of contested rights of the litigants before them; such, for example, as abstract, hypothetical, and moot questions. In principle, at least, the doctrine of obiter dicta is bottomed upon the same general interpretation of the judicial function.

The Anway Case (Anway v. Grand Rapids R. Co.), 211 Mich. 592, 179 N. W. 350, 12 A. L. R. 26, cited in Morrow v. Corbin, was one in which the Supreme Court of Michigan by a divided court in 1920 held unconstitutional a statute of that state authorizing declaratory judgments. The dissent arose over the construction of the statute; all the judges concurring in the disposition made of the case before the court. The majority construed the wording of the statute as including cases calling for advisory opinions; the minority, while agreeing that the case at bar fell within that classification, held that the statute was not intended to include such cases. In the cited subsequent (1930) case by the same court (Washington-Detroit Theatre Co. v. Moore, 249 Mich. 673, 229 N. W. 618, 68 A. L. R. 105), the court unanimously upheld a later statute of Michigan authorizing declaratory judgments, which eliminated the character of cases, the construed inclusion of which was held to invalidate the prior act. In the meantime, some thirteen states had passed declaratory judgment statutes, which were uniformly upheld. Probably the leading case upon the subject is by the Supreme Court of Kansas. State ex rel. v. Grove, 109 Kan. 619, 201 P. 82, 19 A. L. R. 1116.

■ The basic announced principle upon which these statutes are upheld is that judicial power "is not dependent upon any right in the parties to the litigation to consequential relief." In other words, the judicial function embraces the adjudication of the rights of litigants in cases of actual, bona fide controversy, even though no consequential relief is sought or can be awarded at the time.

Due to expressions in some of the opinions of the United States Supreme Court (notably the opinion of Mr. Justice Brandeis in Willing v. Chicago, etc., 277 U. S. 274, 48 S. Ct. 507, 510, 72 L. Ed. 880), it was thought that that court would not under any circumstances review decisions of state courts rendering declaratory judgments, and that Congress did not have the power to authorize declaratory judgments by the federal courts.

In an opinion concurring in the result in the Willing Case, Mr. Justice Stone excepted to a declaration in this regard on the ground that the question was not then involved. He concludes: "There is certainly no 'case or controversy' before us requiring an opinion on the power of Congress to incorporate the declaratory judgment into our federal jurisprudence. And the determination now made seems to be very similar itself to a declaratory judgment to the effect that we could not constitutionally be authorized to give such judgments—but is, in addition, prospective, unasked, and unauthorized under any statute."

On February 6, 1933, the United States Supreme Court, in a unanimous decision (opinion by Mr. Justice Stone), entertained jurisdiction in a declaratory judgment suit from the Supreme Court of Tennessee. The gist of the decision is given in the following headnote: "A 'case' or 'controversy' within the power of the Supreme Court of the United States to review is presented by a proceeding in a state court for a declaratory judgment as to the validity of a tax law, where the provisions of the state statute authorizing such proceeding may only be invoked when the complainant asserts rights which are challenged by the defendant and presents for decision an actual controversy to which he is a party, capable of final adjudication by the decree or judgment to be rendered, and no judgment or decree may be rendered thereunder unless all those who may be adversely affected by it are before the court, and when so rendered it has the force and effect of a final decree." Nashville, Chattanooga & St. Louis Ry. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191.

Complete annotation on the subject may be found in 87 A. L. R. 1205; 68 A. L. R. 110; 50 A. L. R. 42; 19 A. L. R. 1124; 12 A. L. R. 52.

No doubt influenced by the holding in the Wallace Case as to its powers in this regard, the Congress, on June 14, 1934, enacted a declaratory judgment statute (28 USCA § 400), the validity of which has not yet been passed upon by any of the federal courts except inferentially, where it was applied in two cases by the United States District Judge for the Southern District of Mississippi. Memphis, etc., v. Gully (D. C.) 8 F. Supp. 169; Interstate, etc. v. Gully (D. C.) 8 F. Supp. 174.

■ Measured by the adjudicated cases at this time, the validity of the declaratory

judgment as a proper judicial function may be regarded as established in American jurisprudence. The essential difference between the declaratory judgment and the purely advisory opinion lies in the fact that the former is a binding adjudication of the contested rights of the litigants, though unaccompanied by consequential relief; whereas, the latter is merely the opinion of the judges or court, adjudicates nothing, and is binding on no one. The former is held to be the exercise of a strictly judicial function; the latter that of a wholly non or extra judicial function; a distinction recognized in the two cited cases.

Morrow v. Corbin, while following the early Texas decisions, and the dissenting opinion of Chief Justice Stayton, upheld the statute authorizing certification in advance of decision by Courts of Civil Appeals to the Supreme Court upon three grounds (as we read the opinion): (1) "In all cases heretofore cognizable by certified question there have been actual trials and final judgments which the appellate courts may set aside, reform, or affirm and enforce under their appellate powers"; (2) the statute has been followed for forty years, and "the question being one of practice in which the power has been consistently exercised for a long period of time, with no substantive right of the citizen involved, we will presume that there existed then and that there exists now a constitutional basis for the law, although elusive to us, and sustain the statute"; (3) the readoption of section 3 of article 5 of the Constitution, as amended in 1930, without change except as to the term of court carried with it the "construction previously placed thereon by the Legislature in enacting the certification statutes, and of the courts in treating the law as valid by acting thereunder."

Immediately following this portion of the opinion is this paragraph: "We know of no rule by which the constitutional basis for existing certification statutes may be extended to the act before us, which calls for advisory action only, and requires no judgment or decree upon which the appellate power of the revisory courts may act."

The opinion clearly holds that certification in advance of any decision, interlocutory or final, is a request for an advisory opinion. But this application of the term is not, we think, predicated upon the holding that such opinion would not be binding upon the parties as an adjudication of the question certified, but upon the holding of Judge Stayton, that consequential relief (the power of the court itself to enforce its decisions, and not merely to refer them to some other court for enforcement) is essential to jurisdiction. Our present inquiry extends only to a determination of the basis of the holding in Morrow v. Corbin, and its application in the dismissal opinion, as it may have bearing upon a proper interpretation of the answers under the first certificate, and not to any seeming inconsistency between that holding and those in other classes of cases in which jurisdiction has been entertained under apparently analogous circumstances; such for example as the construction of wills, removing cloud from title, adjudication of claims and liens for certification to the probate court, and of claims against the state, when permission to sue has been authorized.

As above shown, the second ground of dismissal of our second certificate reads: "The certificate calls upon the Supreme Court to give an advisory opinion; which is not permitted. Morrow v. Corbin."

The difficulty we have is in reconciling this holding under the supporting citation, with the inclusion in Morrow v. Corbin, within the definition of advisory opinion of answers to certified questions in advance of decision.

Manifestly it was not intended in the dismissal opinion to depart from the practice of entertaining jurisdiction of certification by Courts of Civil Appeals in advance of decision; a practice which was expressly upheld in Morrow v. Corbin. We must, therefore, conclude that, as interpreted by the Supreme Court, the question certified embraced some other element which would bring its answer within the category of advisory opinions.

It was not our purpose to propound such a question to the Supreme Court. Nor was it our purpose, in either certificate, to certify the whole case. The question which it was our purpose to ask in the second certificate was whether, in view of the first certification of the proper locative method upon the whole record, the answer to the first question certified was res judicata of the issues of pleading, theory of the case, agreed boundary, and estoppel. The tentative draft of opinion appended to the certificate was merely for the purpose of showing the respective contentions of the parties in this regard, stating in the strongest light in which we could view them the contentions of those asserting that this answer was res judicata of those issues. In other words, we sought

merely an adjudication of the scope of the answer of the Supreme Court as an adjudication binding upon this court. So interpreted, we are unable to see how the certificate can be construed either as calling for an advisory opinion or as certifying the whole case. We do not understand the rule to be that the whole case is certified, solely because the answers to the questions may be determinative of the entire case.

We are constrained to the view that the Supreme Court must have given some other interpretation to our certificate than we intended, as above expressed, and that we were unfortunate either in its form or wording, in our effort to convey our thought.

The dismissal opinion does not intimate in what way the stated grounds of dismissal apply to the question certified. However, the opinion introduces a quotation from our certificate with the following: "In describing the 'tentative draft of opinion' the certificate states." The significance of this statement and the quotation following it, lies, it seems to us, in the implication that the question certified sought advice from the Supreme Court as to how we should apply the answers to the questions first certified in a final disposition of the appeal, and not merely an answer to the above question of law which it was our purpose to certify. To answer such question would, of course, require examination of the entire record, and virtually transfer the entire case to the Supreme Court.

A careful re-examination of our first certificate and the Supreme Court's answers thereon, in the light of the dismissal opinion, leads us to conclude that the Supreme Court did not regard the issues embraced in the question in the second certificate as involved in the first certificate, or as being adjudicated by its answers thereon.

██ We do not think it necessary to review the decisions of the Supreme Court upon the effect of their answers to certified questions. The rules in this regard are well established by repeated adjudication. In the main they are substantially the same as those applied by the Supreme Court of the United States in certificates to that court, and in large measure by the several states under declaratory judgment statutes in determining whether a justiciable controversy is presented. Suffice it to say that the answers of the Supreme Court are res judicata of the questions of law certified, but do not determine, and are not res judicata of,

the application of the answers to the final adjudication to be made by the Courts of Civil Appeals. Of course, the Supreme Court will not consciously answer abstract questions, and has the power, no doubt, aliunde the certificate, to ascertain whether the question is in fact abstract, even though the certificate, as is proper and requisite, states that "the question herein certified is material to a decision of the appeal, and grew out of the nature and result of the proceeding and the facts disclosed by the record before us."

The answers to the first certificate cannot, we think, be treated as abstract or hypothetical, and this especially so since the Supreme Court entertained jurisdiction with the entire record before them as a part of the certificate.

The problem now before us is to determine: What do the answers adjudicate in this case?

It will be noted that in our first certificate we said that, "since we are making no fact findings, it will only be necessary to set forth" the several locative methods contended for in the two cases (Whiteside and California). It was assumed, of course, that there was but one proper method of locating the true lines in each of the three cases, since they all were parts of a single block of surveys, made at the same time by projection as an office survey purely; and this assumption seems also to have been made by the Supreme Court. It seems clear that in entertaining jurisdiction under certification upon the entire record, without fact finding by this court, the Supreme Court must necessarily have examined the facts in each of the three cases sufficiently to determine that upon the record presented the first was the proper locative method in each case. To this extent, and to this extent only, do we think the answer of the Supreme Court is res judicata in either of the two cases certified. From a careful examination of the first certificate, the Supreme Court's answers, the Smith-Turner opinion, and the dismissal opinion, we conclude that it was not the purpose of the Supreme Court to do more than adjudicate the proper locative method, based upon the facts shown by the records in the three cases, leaving it to this court to apply that method in each of the cases certified, and render such judgment as due regard to such method would require. Whether the parties, in either case, had by their pleadings, admissions, case theories, agreed boundary, estoppel, or otherwise, precluded themselves from having that method applied, we

think was not adjudicated. This, we believe, for at least three conclusive reasons:

(1) This latter issue was not expressly within the scope of the first certificate, which merely sought the proper locative method to be applied to the involved surveys. The further question whether the parties were precluded from asserting such method in the particular case was not expressly asked; and, in view of its importance, should not, we think, be presumed to have been answered, merely by involvement resulting from the unusual form of certification upon the entire record.

(2) The question was manifestly not considered by the Supreme Court, otherwise it would have been discussed in the opinion. This we think is clear, even though the Supreme Court was evidently not unaware that none of the parties in this suit was contending for the first locative method. The particular question now under consideration does not appear to have been raised by any of the parties until after the mandate upon the first certificate had reached this court. It therefore seems quite plain that neither the Supreme Court nor any of the parties considered that the questions certified embraced the issues now sought to be held foreclosed by the answers thereto. We think this conclusion is manifest independently of the express limitation by the Supreme Court as to the scope of their answers; to which we do not attach any great significance.

(3) The Supreme Court were well aware of the scope of their inquiry and decision under the first certificate. Had they considered the question now before us as involved in and adjudicated under the first certificate, we believe jurisdiction of the second certificate would have been assumed, and the question certified promptly answered in the affirmative. On the other hand, dismissal of the second certificate upon the interpretation that it certified the whole case and called for an advisory opinion, leads inevitably to the conclusion, we think, that if the Supreme Court had regarded the instant issues as within the scope of the questions certified they would have placed the same interpretation of them as they did upon the second certificate, as certifying the whole case, and either dismissed the first certificate, or expressly limited it so as to leave no doubt of the exclusion of these issues.

■ It is our mature judgment, therefore, that the Supreme Court's answers are predicated upon the entire statement of facts in this case, and constitute an adjudication that such method must be applied by this court, unless appellants are precluded from now asserting such method upon one or more of the grounds urged by appellees as above stated.

■ We will now address ourselves to questions involving the elementary doctrine that, absent fundamental error, assigned error is jurisdictional in this court. Roberson v. Hughes (Tex. Com. App.) 231 S. W. 734.

■ Appellants contend that the record presents fundamental error, in that the case plead by the state and the judgment rendered by the trial court upon the conclusions of law and fact of that court are grounded upon the validity of the Dod resurvey, which the Supreme Court has adjudicated to be invalid as a matter of law. In determining whether asserted error is fundamental, we are, of course, precluded from resort to the statement of facts [Reeves v. Reeves (Tex. Com. App.) 15 S.W.(2d) 606] and are confined to the pleadings and conclusions of fact and law, as bases for the trial court's judgment. If, therefore, the case plead and found by the conclusions of law and fact of the trial court is essentially identical with that adjudicated by the Supreme Court in the three cases before it, then appellants' contention in this regard must be sustained.

A careful analysis of the Supreme Court's opinion in the Smith-Turner Case, and of those in the two companion cases, leads us to conclude that the Supreme Court's decision is predicated upon the facts disclosed by the records in the three cases, and not upon the pleadings or conclusions in the cases certified. The opinion in the Smith-Turner Case, the holding in which is expressly made controlling in the companion cases, refers throughout to the testimony and other evidence disclosed in the statements of facts. The calls in block 194 for the lines and corners in surveys in block 178 are disregarded upon the express holding that the evidence shows that Durrell, when he made the office survey of block 194, did not know the location of the line in block 178. We quote from Judge Pierson's opinion, Turner v. Smith, 122 Tex. 338, 61 S.W.(2d) 792, at page 800: "As to the surveys in block 178 for which Durrell called to adjoin on the south, his own testimony in this case, as well as his sketch and field notes, demonstrate that he did not know their true positions, but called for them merely by conjecture. As before stated, the rule is well established that a call for adjoinder with an unmarked line made upon misapprehension, mistake, or con-

jecture will be disregarded, and the junior survey located according to course and distance from the nearest established corners, and this is true, regardless of whether the entire junior survey was actually run out on the ground, or was wholly or in part an office survey."

Much stress is laid by appellants upon the following quotation from the opinion [122 Tex. 338, 61 S.W.(2d) 792, at page 803]: "The attempt of the land commissioner and Capt. Dod was to intentionally and purposely put excess acreage into each of the sections of block 194 in proportion to the excess in the blocks south of said block 194. We are holding that it is not the policy of the state to create excesses in surveys. In fact, the state of Texas has spent large sums of money trying to discover and reclaim excesses in the surveys all over Texas, and the Legislature has enacted statutes for that purpose. This court has held in the case of State v. Post, 106 Tex. 468, 169 S. W. 407, that in resurveying a tract of land the surveyor must follow the survey as made originally by the locating surveyor, and is not authorized to add acreage thereto. The land commissioner had no authority or right to instruct Surveyor Dod to purposely and intentionally increase the acreage in the various blocks of 194 because there appeared to be from calculations excess in the surveys of two or more of the blocks to the south."

This holding is necessarily rested upon the prior holding that these calls for the southern surveys were made by mistake, and the land commissioner was without power to locate the surveys other than they should be located under the work of Durrell.

We do not construe the petition in this case as claiming any different authority in the land commissioner; or as asserting any validity in the Dod survey other than as a correct actual survey on the ground based upon the work of Durrell. The land commissioner, it is true, purposely required Dod to include excesses, east and west, over calls. Not arbitrarily so, however, but because he so interpreted the work of Durrell, based upon adjoinder calls for the southern surveys, which he construed as controlling. Under the allegations and court conclusions, we think this construction was correct. The land commissioner under a like construction also consciously required the inclusion of excesses, north and south, by reason of adjoinder calls for the east line of block Z. This construction the Supreme Court unanimously approved.

The pertinent portions of the petition are paragraphs 3 to 7, inclusive, which read:

"3. Plaintiff further says that several blocks of land adjoining and surrounding block 194, G. C. & S. F. Railway Company Survey in Pecos County, Texas, were surveyed and established on the ground prior to any survey of said block 194; that block Z adjoining and immediately west of the land above described was surveyed and marked on the ground in the year 1882, and that the east line of said block Z, which constitutes the west line of that part of block 194 above described, was definitely marked on the ground and is still so marked so that its location is unquestioned and definitely established. That block C-4, south of block Z and southwest of block 194, was surveyed on the ground in 1881, and that block C-3, which is directly south of block 194 with block 178 intervening between it and block 194, was surveyed on the ground in 1881 with well defined marked corners. The southeast corner of section 1 in said block C-3, which is also the southeast corner of the block, was marked on the ground in 1881 and is still so marked, and at the same time the northwest corner of 5 in said block C-3, which is also the southwest corner of 6, southeast corner of 7, and the northeast corner of section 8 in said block was marked on the ground and is still so marked and recognized as an established corner. That I. & G. N. Railway Company Survey No. 1, known as the River Survey, was run out and marked on the ground with well established corners of its various sections in the year 1876. The land now covered by blocks 178, 194, Runnels County School Land and I. G. Yates Survey No. 12,341 constituted a large body of unsurveyed public domain of the State, which was completely surrounded by blocks of land surveyed and marked on the ground at the beginning of the year 1882. In 1882 W. L. Durrell, a surveyor returned field notes to the Land Office covering Runnels County School Land and thereafter in the same year he returned field notes covering block 178, and in the year 1883 he returned field notes covering block 194, G. C. & S. F. Railway Company survey.

"4. At the time said W. L. Durrell returned such field notes, he drew the field notes without making a survey in the field, and from data taken from maps and field notes of the said surrounding surveyed blocks, and without personal knowledge as to the location of the lines and corners on the ground, and with a mistaken idea as to the true loca-

tion of the west end of the several river sections in said block No. 1, with reference to the marked corners in block Z, block C-3 and block C-4, so that in his field notes he made a very serious error both as to course and distance of the lines in the several sections in block 194 in the calls of the eastern tier of sections in said block to adjoin the river sections in said block No. 1.

"5. After W. L. Durrell had returned his field notes, as above alleged, the Commissioner of the General Land Office discovered the mistake in calling for joinder with the river sections and directed that the field notes be corrected to eliminate such calls for joinder, and thereafter about the year 1917 the Commissioner of the General Land Office authorized and directed R. S. Dod, a land surveyor, to resurvey said area and to make a report to the General Land Office of such survey. The Land Commissioner under the law in existence at that time had full authority to direct such survey, as provided in Articles 5347, 5352, 5353, 5354 and 5355, of the Revised Statutes of 1911, and other laws then in effect.

"6. Pursuant to instructions given him by the Land Commissioner, R. S. Dod proceeded to resurvey the area and in so doing he found and recognized as they are now recognized upon the ground many original corners of said block No. 1, the southeast and northeast corners of block Z, the southeast corner of block C-3, the southwest corner of section 6 in block C-3, which is also the northwest corner of section 5, and the northeast corner of section 8 and the southeast corner of section 7 in said block. He also located and recognized the marked southwest corner of section 7, and the northwest corner of section 7 in said block C-3. He surveyed and marked on the ground corners of Runnels County School Land No. 3 and the lines and corners of survey No. 34½ and of the I. G. Yates Survey No. 12,341, thus leaving that part of block 194 above described completely surrounded with marked corners. He reported to the Land Office that in order to make block 194 and the surveys therein uniform and to correspond with the other established blocks, a meridian should run due north from the northwest corner of section 7 in Block C-3 through blocks 178 and 194 to the Northeast corner of section 28 in block 194, and that such line should form the eastern boundary line of a tier of sections in block 194 and that the excess distance between said meridian line and established eastern line of block Z should be apportioned among the several surveys in that part of said block

194, and that the rest of the surveys in said block should be put in with reference to the fixed lines and corners hereinabove alleged.

"7. The Land Commissioner, as he was authorized to do, approved the survey and report of R. S. Dod, and thereafter issued a patent covering survey No. 34½ and I. G. Yates survey No. 12,341 and thereafter continuously recognized the various surveys in said block 194 as constructed according to the said survey and report of R. S. Dod."

We direct especial attention to paragraph 4 in which it is alleged that the mistake (and only alleged mistake) of Durrell was as regards the ground position of the river surveys "with reference to the marked corners in Block Z, Block C-3 and Block C-4; due to his lack of knowledge in that regard."

The pertinent portions of the trial court's conclusions of fact and law are correctly stated substantially in the following from one of the briefs on file:

"(No. III) Block C-3 was surveyed on the ground in 1881 with marked corners at the southeast of survey 1, (which is identical with 43 in A-27) and with marked corners at the Southeast and Southwest corners of Section 7, which can still be identified on the ground.

"(No. IV) Block C-4 was surveyed on the ground in 1881 after Block C-3 with marked corner at the Northwest corner of Section 3; the original Northwest corner of Section 3 and the Northeast corner of Section 5 being the 'Perry Hill Corner,' was and still is established on the ground.

"(No. V) Block Z adjoining C-4 was put in in 1882. The Northwest corner of Section 3 in C-4 (the Perry Hill Corner) was made the Southeast corner of Section 2 in Block Z; and, the marked 'Canyon Corner' as the Northeast corner of Section 33 in Block Z.

"(No. VII) Block 178 was put in in November, 1882, by Durrell, as an office survey, the South and Southwest sections in which call for adjoinder to the Section corners in Block C-3. The West sections in 178 adjoin Block C-4.

"(No. VIII) Block 194 was an office survey by Durrell in May, 1883. He Platted in the sections in the block to join, by prolongation, the lines in Blocks 178 and Z, to the river surveys on the East, and on the North to the Runnels County school lands. The Court makes this particular finding: 'At the time L. W. Durrell put in the surveys of Block 178 and 194, he considered certain the location of Block C-3, Block C-4 and Block

Z,' but considered the Runnels County and Pecos River surveys uncertain as he did not know the course of the Pecos River. Had he known the location on the ground of these river and school surveys, he would not have called for them.

"(No. IX) 'I find that L. W. Durrell platted in Block 194 by beginning at the Northeast corner of Block Z, scaling in the first 40 sections in the order of their numbers. He platted these sections in so as to avoid conflict with his map position of Runnels County school land and the river sections, intending that Block 194 should be tied definitely to Block Z and Block 178, but not intending that the sections in 194 should be extended beyond their field note calls or map position, to reach the river sections and the Runnels County School Land.'

"(No. XV) Dod surveyed the land in 1917. He found the marked corners on the ground of Sections 1, C–3; 7, C–3, 3, C–4, and the Canyon corner, and tied 194 to 178 as Durrell had done.

"Upon the findings of the Court concluded that the excess resulting in Block 194 from the establishment of the meridian North from the West line of Section 7 in C–3 should be apportioned between the sections and that the Dod survey was valid, thus leaving the lines where they were. The contention of the State was sustained and that of the defendants, who wanted Block 194 constructed from the river surveys Westward, rejected."

■■■■ These findings established that the relative position of block Z to blocks C–3 and C–4 was known to Durrell and his calls for adjoinder thereof in his field notes of block 178 and his calls for adjoinder to the latter in his field notes of block 194, were not the result of mistake, but were predicated upon correct information as to the true interrelated positions of blocks Z, C–3, and C–4. The fact that Durrell may not have known of the excess of 68 varas, or 23 acres, per section is not important; in like manner as is his lack of knowledge of the excess in the east line of block Z (30 varas or 10 acres per section), calls for which the Supreme Court approved. His pleaded and found intention of adjoinder, absent mistake in the related position of the stated blocks, for adjoinder to which he expressly called, is controlling. This proposition is, we think, abundantly supported by authority in this state. The subject is fully discussed in Phillips Petroleum Co. v. State (Tex. Civ. App.) 63 S.W.(2d) 737, which was decided, and in which writ of error was re-

fused after the decisions in the Smith-Turner and companion cases. The following principle, announced in that case, is applicable here: "Location of boundaries of office survey of land granted depends on intention of surveyor and parties to grant, as gathered from terms thereof in light of surrounding circumstances, where surveyor's footsteps cannot be traced."

■■■■ The principle announced in the following quotation from the leading case of Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237, 239, we think, is likewise applicable in construing the legal effect of the pleadings and trial Court's conclusions before us: "When unmarked lines of adjacent surveys are called for, and when, from the other calls of such adjacent surveys, the position of such unmarked lines can be ascertained with accuracy, and when, in the absence of all evidence as to how the survey was actually made, there arises a controversy as to whether course and distance or the unmarked line of another survey shall prevail, we see no good reason why the survey line should not be given the dignity of an 'artificial object,' and prevail over course and distance."

A careful examination of the briefs filed prior to the answers to the questions first certified discloses that no assignment was presented by any party now seeking reversal, challenging the correctness of the trial Court's conclusions giving effect to the Durrell field note calls for adjoinder to block 178 and of that block for blocks C–3 and C–4. The original brief of appellants Federal Royalty Company and P. S. Moore, contains nine assignments of error, the first eight of which complain, in varied manner, of the trial court's failure to give effect to all adjoinder calls in the Durrell field notes, including those for the river surveys, and Runnels county school land; and of the trial court's action in giving effect to the act of the land commissioner in directing the alteration of the Durrell field notes, by eliminating the calls for the last-named surveys.

These appellants now contend that under the elementary principle that the reasons given in an assignment of error are not binding, their fifth assignment and propositions thereunder, assailing the Dod resurvey, entitles them to have the judgment reversed under the Supreme Court's adjudication of the invalidity of that resurvey. The fifth assignment reads: "The trial court erred in refusing to treat Block 194 as surveyed and located by Durrell as one large and entire tract or survey appropriating the whole of such

body, a public unappropriated land, and in refusing to apportion the excess or shortage of acreage within such system in such manner as to leave the original consecutive order or position of such surveys intact, so as to disturb as little as possible the original configuration of said entire block."

We are unable, by any rational process of construction, to give the language employed in this assignment the meaning which appellants now seek to ascribe to it. The only interpretation of which the language will admit is, we believe, that the trial court erred in not construing the Durrell survey as an appropriation of the entire body of unappropriated public domain; which can only mean that the court erred in not giving effect to all adjoinder calls in the Durrell field notes, including those for the southern surveys. An assignment must point out the particular error complained of. And this alleged error is the only asserted error which the assignment points out. An assignment that the court erred generally in its action or judgment, without specifying in what respect, or the particular ruling complained of, is too general to warrant consideration. It is nothing more than an invitation to the appellate court to search the entire record and determine therefrom whether a correct judgment has been rendered. It furnished no basis for review other than for fundamental error, which may be considered without being assigned. Appellants' contention in this regard is in no way aided by supporting proposition, statement, or argument in their brief. True, they assail the validity of the Dod resurvey; but upon the sole ground that there was no authority in him or in the Land Commissioner to disregard the Durrell calls for the river and school land surveys. They nowhere assail, but repeatedly assert, the validity of all adjoinder calls in the original Durrell field notes including those for the southern surveys. As shown above, neither the pleadings nor court's findings attach any validity to the Dod survey as an original location of the lands. Its validity is predicated upon the proper interpretation of the Durrell location as calling for the southern surveys, and the invalidity of the Durrell calls for the river and school land surveys. The Dod survey was made upon the ground upon the assumption by the land commissioner that this method was a correct interpretation of Durrell's work. So far as we have been able to discover, no party to the appeal has ever questioned the accuracy of Dod's work in accordance with this hypothesis. To hold that this assignment in any way draws in question the

action of the trial court in according validity to the Durrell calls for the southern surveys would do violence, not alone to the language of the assignment, but to the contentions of these appellants thereunder.

It is further contended that since this court "set aside its previous submission and set the case for further argument * * * and in its order so doing requested counsel to either rebrief the case or file further briefs or arguments in the light of the answers of the Supreme Court to the questions certified, and eliminate such questions or issues as are determined by such answers," certain named appellees (now seeking reversal) are entitled, under article 1844, R. C. S. 1925, as amended in 1931 (Acts 1931, c. 75, § 1 [Vernon's Ann. Civ. St. art. 1844]) "to file cross assignments of error complaining of the matters involved in the appeal which were solely and alone the construction of block 194 as surveyed by L. W. Durrell; hence said appellees are entitled to file cross assignments of error as to the judgment which failed to establish the boundaries of Block 194 as originally surveyed by said surveyor."

As already noted, this case was submitted and argued orally at length prior to the first certification. That submission has never been set aside by this court. What actually happened was, that after the Supreme Court's answers had been certified to this court, an order was entered that "the above case be set for further oral argument"; the order further providing: "In the meantime, counsel are requested either to re-brief the case, or file further briefs or arguments, in the light of the answers of the Supreme Court to the questions certified; and eliminate such questions or issues as are determined by such answers."

The same order was made in the California Case, and its purpose and scope are stated in our opinion therein. (70 S.W. (2d) 452, at pages 464, 463). The amendment to article 1844 (Acts 42d Leg. p. 117, c. 75, § 1 [Vernon's Ann. Civ. St. art. 1844]) in no way dispensed with the requirement for assignment of all error relied upon other than fundamental. The only change wrought by the amendment was to dispense with filing the assignments in the trial court. It is still required that they be embodied in the brief. Lamar-Delta County Levee Imp. Dist. v. Dunn (Tex. Com. App.) 61 S.W.(2d) 816. The purpose of our order was, as clearly stated therein, to eliminate from the briefs and arguments the issues which the Supreme

Court's answers had eliminated from the case, and to further present, or at least point out, the issues which still remained for review. Whatever may be the powers of Courts of Civil Appeals as regards rebriefing under the stated amendment or otherwise, we know of no rule that would extend this power to the point of permitting assignments after submission, argument, and certification, injecting into the case an entirely new theory which no complaining party ever urged, either in the trial or appellate court. Much stress is laid upon the great injustice that will result from affirmance of the instant judgment, in that those holding interests in the eastern tier of surveys will have to bear the entire loss of excess acreage arising from application of the first locative method in the Smith-Turner Case and the second locative method in this case. It may be conceded that this necessary result of affirmance constitutes a palpable injustice. But that fact, standing alone, gives no warrant of authority for disturbing the trial court's judgment. The asserted injustice is not in any sense the result of surprise or inadvertence. The first locative method was not a new theory discovered after the appeal, submission, and certification of this case. All three of the cases were brought upon the theory of the validity of the first locative method. In the Smith-Turner and California Cases, that method was judicially established by judgments of the trial courts. The abandonment of that method in this case by the Attorney General in behalf of the state was not until after both of these judgments had been rendered. After this abandonment, the reduction of area involved in the suit and the dismissal of all parties having no interest in that area and prior to the first certification herein, no party to the suit ever, in any way, urged the first locative method either in the trial court or this court. The fourth method may be discarded as having no further bearing upon the case. Excepting which, the only theories of recovery or defense ever presented were the second and third methods which differed only in the elimination vel non of the Durrell calls for the river and school land surveys. Both asserted the validity of the Durrell calls for the southern surveys. In this connection we refer to the statement (copied above) of the second and third methods in our first certificate, to which no party to the appeal, either in this court or, so far as we are advised, in the Supreme Court, registered any complaint. With what may have motivated appellants in not asserting the first locative method as a precautionary alternative theory (if that course was in fact open to them—a question upon which we express no opinion) we are not here concerned. They were represented by able counsel who probably regarded it unwise or inexpedient to adopt such course, as being calculated to weaken their position in urging validity of the adjoinder calls for the river and school land surveys. The oil deposits, with which they were alone concerned, were richer toward the east, and gradually diminished in value toward the west. It was to their interest to hold the surveys as far to the east as possible, and they no doubt concluded that to urge, even alternatively as a dernier ressort, the validity of the first method, might be treated as a lack of confidence in the soundness of their position that the Durrell adjoinder calls must be given full effect. It is conceded that their interest lay in upholding the second locative method, if the third was not sustained. In any event, they deliberately chose not to urge or present under any contingency that might arise, the first locative method; and they are now precluded from asserting it as the proper one to be applied in this case, regardless of its inherent validity; and notwithstanding the Supreme Court's answer under the first certificate.

This holding is not rested upon any mere technical procedural rule. It is grounded upon the oft-applied salutary doctrine that parties will not be permitted to try a case upon one or more theories of recovery or defense, regardless of inherent validity, and thereafter obtain a reversal of the judgment rendered in accordance therewith upon an entirely different and inconsistent theory. See Boatner v. Ins. Co. (Tex. Com. App.) 241 S. W. 136. And this is true even though the theory supporting the judgment presents fundamental error.

The inherent soundness of the principle upon which this holding rests is abundantly manifest in this case. The Yates oil field has been developed in reliance upon the assumed integrity of the Dod resurvey. Under the offset theory a large number of the wells have been drilled in relatively close proximity to the survey lines. To apply the first locative method at this time would move all survey lines to the west, resulting in divesting the ownership of wells out of those who had drilled them, and vesting it in others who had theretofore made no claim to them. Interminable litigation in readjustment of the relative rights and liabilities growing out of the vast number of conflicting interests concerned would be inevitable. We cannot even surmise the issues that would have been pre-

sented, or the supporting evidence that would have been adduced had the first locative method been injected in any manner in the trial court; nor what in that event would have been the result of the trial. The record, however, shows that there are a large number of parties to the suit who are not represented by counsel, the reason for which is thus given in an "additional statement" filed by the state: "When the Whiteside Case was being prepared for trial in the trial court, the Attorney General addressed to the parties at interest a communication stating that the State would seek to uphold the Dod lines, and would attempt to prevent the moving of boundary lines of the sections of land sued for by the State, in its amended pleadings in the Whiteside Case (such amended pleading having eliminated sections 30, 31, 32, 33 and 34, Blk. 194). Acting upon that statement, scores of royalty owners waived service of citations, entered voluntary appearances, and many did not even employ counsel. The sole question to be determined by the trial court was whether the lines of the sections sued for by the State in its first and second amended petitions should be moved eastward, or should remain as then accepted upon the ground (122 Tex. 369, 61 S.W.(2d) 804, 805). No party to this case contended in the trial court that the lines should be moved west. Douglas Oil Co. v. State, 122 Tex. 369, 61 S.W.(2d) 804, 805. Since the trial court judgment left the lines as they had been accepted upon the ground (map Turner v. Smith, 122 Tex. 338, 61 S.W.(2d) 792, 798), and since the appealing defendants contended that the involved sections should be given more land than was claimed for them by most of the owners (map, 122 Tex. 338, 61 S.W.(2d) 792, 799), numerous land owners doubtless felt protected in any eventuality, little dreaming that various appellees would suddenly shift position on appeal, and seek a judgment not sought by any party in the trial court. Since no party in the court below sought to move the boundary lines to the west, the inarticulate multitude of defendants followed the lead of the State, and rested upon the trial court judgment. A very small minority of the appellees in this case now reverse all their former positions, and seek a new judgment, not elsewhere sought in this lawsuit."

The state's petition averred as the express purpose of the suit the establishment of the Dod resurvey as a correct application on the ground of the work of Durrell; the expressed occasion for the suit being the fact that Whiteside, Douglas Oil Company, and others were asserting that the incorrect calls of Durrell for the river and school surveys should be recognized in order to give sections owned by them a large excess acreage. All parties to this suit have had their day in court upon issues they themselves have made, and upon theories (whether of recovery or defense) which they themselves have asserted to be valid. None of them can in justice and fairness to the others now obtain a reopening of the case, with the necessarily incidental enormous expense and injurious delay, the sole purpose of which would be to permit them to assert a wholly different theory from that upon which the case was tried, and thereby obtain the correction of an error which they themselves have invited.

It should be added that no one either here or in the trial court has questioned the adjudicated field notes as an accurate delineation of the several surveys on the ground, in accordance with the adopted theory of the trial court, that validity must be given to the Durrell calls for the southern surveys, and his calls for the river and school surveys must be rejected.

The ninth assignment of error of the complaining original appellants is directed against the trial court's action in overruling pleas in abatement and of nonjoinder of necessary parties contained in their answer and cross-action.

In the original petition the area sued for embraced all the land bounded by block Z on the west, block 178 on the south, and the river and school surveys on the east and north, making parties defendant all claimants to any of said area. The amended petition, upon which the trial was had, reduced the area in suit by eliminating the lands lying east of the east line of sections 19, 22, 23, and 28, block 194. The state thereupon dismissed as to all defendants except those who were asserting interests in lands lying west of the east line of these surveys established according to the state's adopted locative theory. This dismissal included the Turner interests in the asserted vacancy between the Yates survey on the east, and the east lines of the eastern tier of surveys in block 194 on the west. Appellant Federal Royalty Company, owner of royalty interests in sections 30 and 32, filed a plea in abatement and of nonjoinder of necessary parties, and a cross-action. Its coappellant Moore adopted these pleadings. The latter are quite lengthy, but in substance they are predicated upon the validity of the third locative theory as extending block 194 to the

east and north in accordance with the Durrell calls for the river and school surveys. They sought (1) to have the suit abated because of the dismissal of the parties affected by that locative theory; and, (2) to have those parties retained or brought into the suit so as to adjudicate their title in the 'two named surveys located according to that theory. In the state's amended petition, none of the lines of sections 30 and 32 were sought to be adjudicated, except the west line of section 32 incidentally, in that it was coincident with the east line of section 23. The east line of block 194 was already in litigation in the Smith-Turner Case, to which said appellants and all parties which they sought to retain or implead in the suit were parties. The state had the right to reduce as it did the area in suit, unless (in any event) some substantial right of other litigants was thereby deleteriously affected. The right of the state to bring into the litigation the land involved in the Smith-Turner Case may be seriously questioned, if not confidently denied. At all events, its elimination was not improper. Certainly the complaining appellants were without right to bring into this, a subsequent suit, the lands involved in the Smith-Turner Case, to which they were parties' and by the judgment in which they were bound.

The above conclusions are decisive of the appeal; but we think it proper to advert briefly to some of the other questions presented.

██ While the state plead agreed boundary, the judgment was not predicated upon that theory. Hence we are not at liberty to consider it.

As we construe the state's petition, estoppel was plead only against the claim of validity of the Durrell calls for the river and school land surveys, and of the invalidity of the act of the land commissioner in deleting those calls from the eastern tier of surveys in block 194.

██ Stanolind Oil Company, which did not appeal or otherwise seek reversal until after the Supreme Court's decision, now points out certain alleged discrepancies between the field note distance calls in the state's petition and those in the judgment, as constituting fundamental error. As we have already stated, the state specifically plead the validity of the Dod survey as a correct delineation on the ground of Durrell's work, and no par-

ty to the appeal has questioned the accuracy of the field notes in the judgment in accordance with this theory. Mere discrepancies in the distance calls between the pleadings and the judgment are unimportant, in view of the particularity with which the pleadings and the trial court's findings detail the method pursued by Dod and its admitted accuracy, and that of the trial court's findings and judgment under the second locative method which ascribe validity to the calls for the southern surveys. No error in the judgment field notes is pointed out or claimed, other than that in some respects they do not accord exactly with corresponding distance calls in the petition. These discrepancies do not in our opinion constitute fundamental error, or warrant reversal of the judgment. We think it was within the province of the trial court to render judgment in accordance with the Dod theory, conforming the field note calls thereto, and disregarding any slight variation in distance calls in the petition.

██ The state has filed an "additional statement," in which it asserts fundamental error in the portion of the trial court's judgment locating (as against it) the boundary lines of surveys 31 and 33, block 194. The petition of the state in this regard is correct. Its pleadings did not embrace those surveys, and, if the judgment may properly be interpreted as binding the state in this regard, it is erroneous. Those surveys were brought into and retained in the case in a cross-action of the Douglas Oil Company against the Yates interests, and the judgment as to these surveys should be limited in its binding effect to those parties. It was no doubt only so intended by the trial court, and we so construe it.

██ It is also asserted that there are discrepancies between the judgments in this and the California cases as to some of the survey lines common to the two suits. It is not within the province of this court to examine the record in another case and conform the judgment before us for review to the judgment in that case. The point was not raised in the trial court, and cannot properly be considered by us on appeal. If the parties are entitled to conformity in the two judgments, their remedy, we think, is by direct plenary action brought to determine which judgment is controlling.

The trial court's judgment is affirmed.